THIS OPINION IS A
PRECEDENT OF
THE TTAB

Hearing:                             Mailed:
February 25, 2010                    July 28, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**

—————

**Trademark Trial and Appeal Board**

| | |
|---|---|
| Mag Instrument, Inc. | Opposition No. 91163534 (Serial No. 76548626) |
| v. | |
| The Brinkmann Corporation | |

—————                                    —————

| | |
|---|---|
| The Brinkmann Corporation | Opposition No. 91164169 (Serial No. 76484030) |
| v. | |
| Mag Instrument, Inc. | Opposition No. 91164340 (Serial No. 78357215) |

—————

Anna E. Raimer, Esq. of Jones Day for Mag Instrument, Inc.

Gary A. Clark, Esq. of Sheppard, Mullin, Richter & Hampton LLP for The Brinkmann Corporation

—————

Before Cataldo, Taylor, and Wellington, Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

This case comprises three consolidated opposition proceedings.

**Oppositions Nos. 91163534, 91164169 and 91164340**

First, in Opposition No. 91163534, Mag Instrument, Inc. (hereinafter "Mag Instrument") has opposed an application filed by The Brinkmann Corporation (hereinafter "Brinkmann") to register the mark MAGNUM MAXFIRE on the Principal Register for "hand-held portable lights, namely flashlights and spotlights" in International Class 11.[1]  Mag Instrument's opposition is based on allegations that Mag Instrument has prior use of confusingly similar marks, including a famous family of "MAG" marks, on flashlights and/or related accessories, under Section 2(d) of the Act. Mag Instrument pleaded ownership of numerous registrations for marks consisting, in whole or in part, of the term MAG, including the registered mark MAG-NUM STAR for "flashlight bulbs."[2]  In its answer, Brinkmann denied the salient allegations of the complaint and asserted a "Morehouse" defense based on its ownership of a prior registration of what Brinkmann contends is a mark substantially similar to its applied-for mark, for identical or substantially similar goods.

In the second proceeding, Opposition No. 91164169, Brinkmann has opposed Mag Instrument's application to register the following configuration mark (hereinafter,

---

[1] Serial No. 76548626, filed on October 3, 2003, under Section 1(b) (intent-to-use).
[2] Registration No. 1245187, issued July 12, 1983; Sections 8, 9 and 15 affidavits accepted and granted; renewed.

"dual band mark") on the principal register under Section 2(f) (acquired distinctiveness):



for "flashlights."[3]

The application contains the following description of the mark:

> The mark consists of two bands that encircle the barrel of the flashlight. The outline of the flashlight is not part of the mark but is merely intended to show the position of the mark.

Brinkmann opposes registration of this dual band mark on the grounds that it is "functional" because it "represents the charging rings" of applicant's flashlights and this design "is essential to the use or purpose of the [flashlight] or it affects the cost or quality of the [flashlight]" (Not. of Opp., para. 7); and that the mark "has not become distinctive of [applicant's flashlights]." (*Id.*, para. 9).

Mag Instrument, in its answer, denies the allegations that its proposed dual band mark is either functional or that it lacks distinctiveness.

In the third proceeding, Opposition No. 91164340, Brinkmann has opposed Mag Instrument's application to register the mark MAG STAR on the principal register for

> Electric flashlight accessories sold together or separately, namely rechargeable batteries, battery chargers, electrical converters, power cords, charger cradles, flashlight recharger adapters for use with vehicle cigarette lighters, battery packs for flashlights, voltage converters, foreign plug adapters in International Class 9; and

> Flashlights and related parts, component parts and accessories therefor, namely replacement flashlight lamps, combination lens holder/anti-roll units adapted to fit on the barrels of flashlights and leather and nylon carrying holsters and belt holders in International Class 11.

Brinkmann pleads ownership of the registered mark MAXSTAR for "electric lanterns"[4] and alleges that Mag Instrument's use of the MAG STAR mark on the aforementioned goods is "likely to cause confusion, to cause mistake, and to deceive customers, potential customers and others, thereby injuring [Brinkmann] and the consuming public." (Not. of Opp., para. 9).

Mag Instrument, in its answer, denies the salient allegations of the opposition.

---

[3] Serial No. 76484030, filed January 21, 2003, under Section 1(a), based on an allegation of first use anywhere and in commerce on December 31, 1982.
[4] Reg. No. 1565777, issued on November 14, 1989, renewed.

### Consolidation

The three opposition proceedings were consolidated at the discovery stage.[5]  Thus, the proceedings were tried together and arguments were presented in combined briefs.

### The Record

The record automatically includes the pleadings and the files of all involved applications.  Trademark Rule 2.122(b).

The parties also submitted the trial testimony, with accompanying exhibits, of the following individuals:  James L. Zecchini, a Vice President for Mag Instrument; J. Baxter Brinkmann, CEO and owner of Brinkmann; Gus Hawthorn, Director of Engineering for Mag Instrument; Anthony Maglica, President of Mag Instrument; and Professor Martin J. Siegel, an expert witness testifying on behalf of Mag Instrument.[6]

In addition, Mag Instrument filed two notices of reliance that include:  copies of registrations owned by Mag

---

[5] Pursuant to Board order (dated March 17, 2006).  Opposition No. 91163534 was designated the "parent" proceeding and, as such, is the file containing all orders and submissions subsequent to the consolidation order.

[6] Both parties designated portions of the record, including documents and testimony, as "confidential."  We have, of course, considered all evidence of record, but are mindful of the portions designated as "confidential" and thus refer to such materials in only general terms where practical.  Therefore, any omission of specific reference to these materials, or any other evidence, should not be construed as indicating that such has not been considered.

Instrument,[7] copies of registrations owned by Q-Beam

Corporation and Brinkmann, copies of documents produced by

Brinkmann in response to Mag Instrument's discovery

requests,[8] and copies of Brinkmann's responses to certain

interrogatories propounded by Mag Instrument.

Brinkmann filed a notice of reliance upon the status

and title copies of three registrations that it owns.

Both parties filed briefs in their respective positions

as both plaintiff and defendant in these consolidated

proceedings.  In addition, counsel for both parties

presented arguments at an oral hearing held before the Board

on February 25, 2010.

### Evidentiary Objections

Both Mag Instrument and Brinkmann have raised

objections to evidence introduced (and relied upon) by the

other.

1.  Zecchini Testimony and Exhibits M128 and M132

Relying on the "best evidence rule," Brinkmann has

objected to certain deposition testimony of Mr. Zecchini

involving sales summaries and related exhibits, marked as

---

[7] Status and title copies were submitted for the registrations
owned by Mag Instrument via the second notice of reliance and in
accordance with the Board's December 24, 2008 order.
[8] Documents produced (in discovery) are generally not proper
matter for submission under a notice of reliance alone, unless
they are otherwise suitable for such introduction, *e.g.*, they are
printed publications or government records.  However, in a paper
filed September 26, 2008, Brinkmann specifically conceded that we
may treat the "documents as being of record."

M128 (MAG CHARGER mark flashlight advertising/sales summary) and M132 (WHITE STAR mark lamp sales summary) and moves to strike said testimony and exhibits.[9] Brinkmann asserts that Mag Instrument "failed to produce or make available any of the original invoices or other sales database information that was used to prepare the sales summary information set forth in the [objected exhibits]" (Statement of Evid. Objections, p. 5) in violation of the "best evidence rule." Brinkmann also raises a hearsay objection because Mr. Zecchini either "admitted" or it "would seem apparent" that he did not prepare the exhibits and Mag Instrument cannot therefore "rely on the exhibits for the truth of the matters asserted therein." *Id.* at p. 6.

The aforementioned objections are not well-taken and are overruled.

The "best evidence rule" is a common law proposition that has been codified in Rule 1002 of the Federal Rules of Evidence, which states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress." However, the rule has

---

[9] While the motion to strike discusses Exhibits M128 and M132, in its prayer for relief Brinkmann requests that Exhibits M128 and M130, not M132, be stricken. We disagree with Mag Instrument's contention that the inconsistency renders the objections "defective," but we construe Brinkmann's objections based on the "best evidence rule" as being asserted and directed only to Exhibits M128 and M132, not Exhibit M130.

been described as "one of preferences, not absolute exclusion." 6 Weinstein's Federal Evidence Section 1004.01 (2nd Ed. 1997). Thus, there are a string of exceptions to the rule and these are set forth in the subsequent rules, including "[t]he original is not required, and other evidence of the contents of a writing...is admissible if...the writing...is not closely related to a controlling issue." Fed. R. Evid. Rule 1004(4). In this case, we find that Exhibits M128 and M132 are not "closely related to a controlling issue" and, as such, are not susceptible to Rule 1002. That is, Mag Instrument introduced the summaries for purposes of demonstrating a level of use for products bearing the MAG CHARGER and WHITE STAR marks from which one may possibly gauge the degree of success or exposure of products bearing those marks. Said purposes are not closely related to the controlling issues involved in the likelihood of confusion analysis.

As to Brinkmann's hearsay objections to Exhibits M128 and M132, including the deposition testimony relating to the exhibits, we find them to be without merit in view of the fact that the exhibits are summaries of business information that were prepared by individuals under Mr. Zecchini's supervision. In addition, Mr. Zecchini testified that he had the requisite knowledge and was personally aware of the information contained in the exhibits based on his position

8

within Mag Instrument. *Cf., Crash Dummy Movie, LLC v. Mattel*, Inc., 601 F.3d 1387, 94 USPQ2d 1315, 1317 (Fed. Cir. 2010).

Accordingly, Brinkmann's objections to Exhibits M128 and M132, including the deposition testimony relating to the exhibits, are overruled.

2. Zecchini Testimony and Exhibits Relating to Third-Party Use

Brinkmann objects to certain deposition testimony of Mr. Zecchini and related exhibits (M135-M140) on the grounds that the exhibits comprise internet website printouts that have not been authenticated and that they constitute hearsay.

As to Brinkmann's objection based on the exhibits not having been properly authenticated, we find that this objection was not timely raised and has been waived. See TBMP § 707.03(c) (2d ed. rev. 2004); see also, *Pass & Seymour, Inc. v. Syrelec*, 224 USPQ 845, 847 (TTAB 1984) (objection on grounds of improper identification or authentication of exhibits waived since defects could have been cured if made during the deposition).[10]

_____

[10] Subsequent to the filing of the subject exhibits, the Board modified its handling of internet materials; specifically, "if a document obtained from the Internet identifies its date of publication or date it was accessed and printed, and its source (e.g., the URL), it may be admitted into evidence" because it is considered to be self-authenticating in the same manner as a printed publication in general circulation in accordance with Trademark Rule 2.122(e). *See Safer, Inc. v. OMS Investments,*

As to Brinkmann's objection that Exhibits M135-M140 contain hearsay, we sustain this objection to the extent that applicant is offering these articles for the truth of the matters asserted therein, i.e., as proof that there are actually third-party products in use that function in the manner advertised. Mag Instrument may also not rely on Mr. Zecchini's testimony concerning the existence or veracity of the subject matter of the materials and, in that regard, the testimony is stricken. Despite sustaining the hearsay objection and striking the testimony of Mr. Zecchini related to these exhibits, we decline to strike the materials in their entirety and find them admissible solely for what they show on their face. This probative value is strictly confined to showing that the public may have been exposed to those internet websites and therefore may be aware of the information or advertisements contained therein. *See Life Zone Inc. v. Middleman Group Inc., supra,* 87 USPQ2d at 1956 n.5; *Harjo v. Pro-Football Inc.*, 50 USPQ2d 1705, 1721 n.50 (TTAB 1999); *Logicon, Inc. v. Logisticon, Inc.*, 205 USPQ 767, 768 n.6 (TTAB 1980); TBMP § 704.08.

In sum, the testimony relating to Exhibits M135-140 is stricken. The exhibits themselves are not stricken, but as

---

*Inc.*, 94 USPQ2d 1031 (TTAB 2010). Here, upon review of the internet printouts contained in the subject exhibits, we note that each indicates the URL and date accessed.

explained above they have very limited probative value in these consolidated proceedings.

3.  Declarations of Susan Hwang and Ping Chu

Mag Instrument argues that the declarations of Susan Hwang and Ping Chu which were submitted in support of Brinkmann's objections (discussed above) are "inadmissible." Although it does not appear that Brinkmann sought to introduce the declarations into the evidentiary record, for the sake of clarity, we note that these declarations do not form part of the record and were only considered for purposes of deciding the evidentiary objections raised by Brinkmann.

4.  Brinkmann Testimony

(a) Regarding Alleged Utility Design Features

Mag Instrument objects to the testimony of Mr. Brinkmann concerning any possible utilitarian advantages of Mag Instrument's flashlights (including its battery recharging feature) over competitors' products. Essentially, Mag Instrument argues that to opine in that subject area requires "specialized knowledge within the scope of Rule 702 [governing use of an expert witness]", and that no foundation was laid to establish that Mr. Brinkmann is qualified as an expert witness. Brinkmann, on the other hand, contends that Mr. Brinkmann was merely "identifying and describing the flashlights [of Mag Instrument and

competitors] and their uses with particular focus on their rechargeable features." Brinkmann's Response (filed June 11, 2009), p. 4. And, "to the extent that Mr. Brinkmann made a comparison of the advantages or benefits of the MAG CHARGER flashlight over the four 'alternative' flashlights, he did so as a person whose duties and responsibilities, as president of Brinkmann, regularly include such activity." *Id.*

We do not construe Mr. Brinkmann's testimony as expert witness testimony. Rather, we agree with Brinkmann that Mr. Brinkmann testified in his capacity as president of a competitor of Mag Instrument and, based on his years of experience in the industry, that he is generally familiar with flashlight products. We find that his testimony is not based on "scientific, technical, or other specialized knowledge," as contemplated by Fed. R. Evid. 702. Mr. Brinkmann's opinions concerning the features or advantages of the flashlights clearly fall within the scope of expertise of that expected from an individual who is not an expert witness but has experience and knowledge in the industry. Accordingly, Mag Instrument's objection to this testimony is overruled.

(b) Regarding Settlement Negotiations

Mag Instrument has objected to the testimony of Mr. Brinkmann concerning "negotiations and specific terms of a

12

confidential settlement agreement reached between [the parties] as part of an earlier litigation." The testimony was submitted under seal and Brinkmann did not cite to this testimony in its main brief or reply brief. Accordingly, this objection is not an issue; for sake of clarity, Mr. Brinkmann's testimony on this subject has not been considered.

5. Deposition Questions Involving Alternative Designs

Mag Instrument has objected to questions posed by counsel for Brinkmann during the depositions of Messrs. Zecchini, Hawthorn and Siegel, all Mag Instrument witnesses. Specifically, counsel for Brinkmann asked the deponents whether they would consider certain alternative flashlight designs as infringing on Mag Instrument's applied-for dual band trademark. Mag Instrument objected to these questions as "improper hypotheticals" that call for legal conclusions and that these witnesses were neither qualified to provide opinions in this regard nor did they have authority to represent Mag Instrument in this regard. Mag Instrument takes exception to Brinkmann's conclusion in its trial brief that Mag Instrument "would not commit itself to a position" because the witnesses would not answer the questions.

Upon review of the testimony in question, we do not agree with Mag Instrument that the objected-to questions were improper or that any responses should be stricken.

13

While we note that it was never established that these witnesses were in a position to represent or bind Mag Instrument (and, indeed, some of the witnesses stated that they were not so authorized), the questions posed by Brinkmann's counsel were legitimate to the extent that they were in response to the witnesses' direct testimony concerning proposed alternative flashlight designs. The questions were an attempt to delve into whether the proposed alternative flashlight designs were indeed available and feasible options for others. Accordingly, we overrule the objections and do not strike the testimony. Nevertheless, this does not mean that we draw any adverse inference nor do we necessarily have to reach the same conclusion that Brinkmann did in its trial brief based on the witnesses' responses to the questions (or their inability or refusal to answer). *Cf., Levi Strauss & Co. v. R. Josephs Sportswear Inc.*, 28 USPQ2d 1464 (TTAB 1993)(counsel instructed witnesses not to answer certain questions and, because objections were not well taken, Board presumed answers would have been adverse to party whose counsel raised the objections). Rather, we have considered the responses in the totality of all of the testimony and other evidence concerning possible alternative flashlight designs.

6.  Section 2(f) Evidence

During the prosecution of its dual band mark, Mag Instrument submitted sixteen declarations in support of its assertion that the mark had acquired distinctiveness; however, it did not otherwise introduce the declarations into evidence during its testimony period.  At oral hearing and in papers filed subsequently, the parties disputed the nature of these declarations and whether they should be considered in evidence.

As already noted, Trademark Rule 2.122(b) provides that the file of the application being opposed forms part of the record.  In pertinent part, the rule specifically states "the file...of the application against which a notice of opposition is filed...forms part of the record of the proceeding without any action by the parties and reference may be made to the file for any relevant and competent purpose."  Our primary reviewing court recently interpreted this rule and decided that, "to be clear and unambiguous," the *entire* file of the involved application, "including any evidence submitted by the applicant during prosecution," is part of the record of the relevant *inter partes* proceeding, without any action by the parties.  *Cold War Museum Inc. v. Cold War Air Museum Inc.,* 586 F.2d 1352, 92 USPQ2d 1626, 1628 (Fed. Cir. 2009).  Accordingly, it was unnecessary for Mag Instrument to introduce the sixteen declarations into

evidence during its testimony period because they automatically form part of the record. We have therefore considered them in reaching our decision in Opposition No. 91164169.

### The Parties

Mag Instrument has been in business for over thirty years as a manufacturer of machined-aluminum cased flashlights, as well as related flashlight accessories, upgrade kits and parts. Mag Instrument has used and registered several trademarks for these items, including the mark MAG-LITE. Mag Instrument's annual sales of flashlights and accessories in the United States (both in dollar volume and in units sold) over the last ten years have been very substantial.

Brinkmann has been operating since 1974 as a consumer products company featuring outdoor smokers and grills, cooking products, gardening accessories, and lighting products. The latter goods include hand-held portable lighting products such as flashlights, spotlights and electric lanterns, as well as parts and accessories therefor. Brinkmann has used and registered several trademarks for its lighting products.

Both Brinkmann and Mag Instrument agree that their respective flashlights and lighting products are sold in some of the same retail stores; accordingly, in this

16

respect, the two companies are competitors. In addition, both companies do most of their advertising through co-op agreements wherein they will reimburse retailers for running advertisements that feature their goods.

### Standing

Each plaintiff in the respective oppositions must prove its standing as a threshold matter in order to be heard on its substantive claims. *See, for example, Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982). The Federal Circuit has set forth a liberal threshold for determining standing, namely, whether a plaintiff's belief in damage has a reasonable basis in fact and reflects a real interest in the case. *See Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999). *See also Jewelers Vigilance Committee Inc. v. Ullenberg Corp.*, 853 F.2d 888, 7 USPQ2d 1628 (Fed. Cir. 1988).

In none of the proceedings has standing been contested. The parties have established that they are competitors; and each party has made of record registrations for marks that it relies upon. Therefore, Brinkmann and Mag Instrument each has standing to bring the opposition proceeding(s) for which it is a plaintiff. *See Ritchie v. Simpson, supra*. *See also* TBMP §309.03(b) (2d ed. rev. 2004) and the authorities cited therein.

We now turn to the merits of the consolidated proceedings. We address them individually, beginning with the two oppositions involving the ground of priority and likelihood of confusion.

### Opposition No. 91163534 (MAGNUM MAXFIRE)

Again, Mag Instrument opposes Brinkmann's application to register the mark MAGNUM MAXFIRE on the Principal Register for "hand-held portable lights, namely flashlights and spotlights," based on, *inter alia*, an allegation that Mag Instrument has prior use of the registered mark MAG-NUM STAR for "flashlight bulbs,"[11] and that Brinkmann's applied-for mark is confusingly similar to it.

However, we first address Brinkmann's affirmative defense based on ownership of a registration for a similar mark and goods (the "Morehouse" defense).

Brinkmann's "Morehouse" Defense

The *Morehouse* defense, an equitable affirmative defense, is available in situations where an applicant already owns a registration for the same (or substantially similar) mark and goods or services, and which registration

---

[11] Although Mag Instrument also alleged a likelihood of confusion with other registered marks, and a family of "Mag" marks, we focus our likelihood of confusion analysis in this decision on the registered mark MAG-NUM STAR which is more similar to applicant's mark than any of Mag Instrument's other pleaded marks, including the asserted "Mag" family of marks. And, as discussed further in this decision, there is no real dispute that the goods covered by all of the marks are related.

has not been challenged.  It is based on the theory that an opposer cannot be injured by the registration sought because there already exists a similar registration and, therefore, an additional registration for the same or substantially similar mark and goods or services can no more injure the plaintiff than the prior registration.  *See Morehouse Mfg. Corp. v. J. Strickland & Co.*, 407 F.2d 881, 160 USPQ 715 (CCPA 1969)(no injury from registration of BLUE MAGIC for pressing oil when applicant owned prior registration for BLUE MAGIC for hair dressing and "while there are trifling differences [between the marks] it takes careful inspection to detect them and the record showed the products sold under the two marks were 'one and the same'").

Brinkmann argues that the Morehouse defense is applicable here because it is the owner of an incontestable registration for the mark MAGNUM MAX for "hand-held electrical spotlights";[12] that this registered mark is substantially identical to its applied-for mark, MAGNUM MAXFIRE; that the addition of FIRE in the applied-for mark "is irrelevant because Mag Instrument's allegation of damage relates only to the 'Magnum'/'Mag' portion of Brinkmann's

---

[12] Registration No. 1567003, issued on November 21, 1989, renewed. We further note that Brinkmann is the owner of a second, incontestable registration for the mark MAXFIRE (Registration No. 1919542) for "flashlights."  However, Brinkmann does not rely on this registration, in tandem with its MAGNUM MAX registration, in support of its Morehouse defense.

mark";[13] and that while the subject application identifies "flashlights" and this is not covered by the registration, this is not relevant because flashlights are "identical to spotlights as well, since they are both portable, battery-operated lights, differing in only the shapes of their housings."[14]

We find that the Morehouse defense is not available to Brinkmann in this opposition because the registered mark, MAGNUM MAX, is not substantially the same as that being applied for, MAGNUM MAXFIRE. For purposes of the *Morehouse* defense, the two marks must be "substantially identical," meaning that they are either literally identical or legally equivalent. *See O-M Bread Inc. v. United States Olympic Committee*, 65 F.3d 933, 36 USPQ2d 1041 (Fed. Cir. 1995) (OLYMPIC and OLYMPIC KIDS are neither the same nor legally equivalent). Brinkmann recognizes this, but relies on the Board's decision in *Place for Vision, Inc. v. Pearle Vision Ctr., Inc.*, 218 USPQ 1022 (TTAB 1983). In the *Place for Vision* case, it was held that, as a matter of law, there could be no likelihood of confusion because, despite the clear differences in the previously registered mark (VISION CENTER) and the contested mark (PEARLE VISON CENTER and design), said differences were irrelevant to the harm

---

[13] Brinkmann Brief (filed April 27, 2009), p. 45.

[14] *Id.*

alleged by plaintiff.  That is, opposer's claim of damage related solely to the VISION CENTER portion of the mark, not the term PEARLE or the design element.

Mag Instrument's reliance on the *Place for Vision* decision is unavailing.  Initially, we note that the Federal Circuit's *O-M Bread* decision was decided twelve years after *Place for Vision*, and to the extent there appears to be some inconsistency between the two decisions, we must defer to the views of our primary reviewing court.  In any event, the *Place for Vision* case is distinguishable from the facts and arguments set forth in this case.  Here, Mag Instrument does not rely solely on the common element, MAGNUM, as the only source of similarity between its MAG-NUM STAR mark and Brinkmann's MAGNUM MAXFIRE mark.  Mag Instrument also argues that the addition of the element FIRE in the applied-for mark contributes to the overall similarity because "FIRE is quite close to...STAR in meaning...[the] terms connote burning brightness and illumination."[15]  Thus, we cannot conclude that the differences between Brinkmann's registered mark and its applied-for mark are totally irrelevant or that the marks are effectively equivalents for purposes of the Morehouse defense.

Even if we were to find the additional element, MAXFIRE, to be irrelevant to any possible harm alleged by

---

[15] Mag Instrument Brief (filed May 27, 2009), p. 11.

21

Mag Instrument in this case, we cannot conclude, as Brinkmann would have us do, that "hand-held electric spotlights" are substantially the same as or encompass "flashlights." The *Morehouse* defense requires the goods to be "identical, substantially the same, or so related so as to represent in law a distinction without a difference." *Aquion Partners Limited Partnership v. Envirogard Products Limited*, 43 USPQ2d 1371, 1373 (TTAB 1997). See also, *Haggar Co. v. Hugger Corp.*, 172 USPQ 253 (TTAB 1971) (involving different items of apparel). To support its contention the goods are the same, Brinkmann points to the testimony of Mr. Zecchini, one of Mag Instrument's principals, who states that Mag Instrument would find it objectionable "if someone were to come out with a [Mag Instrument branded] spotlight."[16] This is certainly not conclusive, and has little persuasive value, that flashlights and spotlights are substantially the same goods. Our review of the evidence of record indicates that while flashlights and hand-held spotlights are clearly very similar in nature, the two terms reference two separate categories of hand-held lighting products.

In view of the above, Brinkmann may not rely on the Morehouse defense.

---

[16] Brinkmann Brief (filed April 27, 2009), p. 46, citing to Zecchini Test., p. 157.

We now turn our attention to Mag Instrument's ground of priority and likelihood of confusion.

Priority

The pleaded registration for the MAG-NUM STAR mark is of record, unchallenged, and therefore priority of use is not an issue in this opposition. *King Candy Co. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Likelihood of Confusion

As to likelihood of confusion, our determination is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in *In re E. I. du Pont de Nemours & Co*., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). *See also In re Majestic Distilling Co., Inc*., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003). In any likelihood of confusion analysis, however, two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co*., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

Turning first to a consideration of the marks, we must compare the marks in their entireties as to appearance, sound, connotation and commercial impression to determine the similarity or dissimilarity between them. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En*

*1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods and services offered under the respective marks is likely to result. The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

In comparing Mag Instrument's MAG-NUM STAR mark to Brinkmann's MAGNUM MAXFIRE mark, the obvious similarity is that both marks begin with the term MAGNUM or MAG-NUM. Thus, the initial term in both marks is essentially identical; the hyphen in the Mag Instrument's mark does not distinguish them. *See Goodyear Tire & Rubber Co. v. Dayco Corp.,* 201 USPQ 485, 488 n. 1 (TTAB 1978) ("Fast-Finder" with hyphen is in legal contemplation substantially identical to "Fastfinder" without hyphen); *see also Charrette Corp. v. Bowater Communication Papers Inc.,* 13 USPQ2d 2040, 2042 (TTAB 1989)(PRO-PRINT is similar to PROPRINT). Because MAGNUM/MAG-NUM is the first portion of the marks, this plays an important role in determining whether that term is also the dominant element of the

24

respective marks. *See Palm Bay Imports Inc.,* 396 F.3d at 1372, 73 USPQ2d at 1692 (2005) ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark and the first word to appear on the label); *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992)(upon encountering the marks, consumers must first notice the identical lead word); and *Presto Products Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered").

There is no evidence that the term "magnum" has any special meaning in the lighting products field or that it is otherwise a weak term that should be accorded a narrow scope of protection.

The secondary terms in each mark, STAR and MAXFIRE, are clearly different in sound and appearance. However, we agree with Mag Instrument that both terms may impart a similar suggestive meaning in connection with lighting products such as flashlights (and bulbs therefor) and spotlights. That is, the terms "star" and "maxfire" can be understood, when viewed in connection with lighting products, as suggesting brilliance or illumination of the highest magnitude.

25

In considering the marks as a whole, as we must do, we find that the dominant element in each mark is the term MAGNUM (or MAG-NUM).  Based primarily on this, we find that the marks MAG-NUM STAR and MAGNUM MAXFIRE are highly similar in appearance, sound and connotation, and that the similarities in the overall commercial impressions engendered by the marks as a whole greatly outweigh the differences.

Accordingly, we find this du Pont factor favors Mag Instrument and a finding of likelihood of confusion.

We turn now to the *du Pont* factor involving the relatedness of the parties' goods and keep in mind that it is not necessary that the respective goods be identical or competitive, or even that they move in the same channels of trade to support a holding of likelihood of confusion.  It is sufficient that the respective goods are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originated from the same producer.  *In re Melville Corp.*, 18 USPQ2d 1386 (TTAB 1991).

Here, there appears to be no dispute that the goods covered by Mag Instrument's MAG-NUM STAR registration,

26

namely, flashlight bulbs, are related to the identified goods in Brinkmann's MAGNUM MAXFIRE application, namely, hand-held portable spotlights and flashlights. By definition, they are complementary goods, at least with respect to flashlight bulbs and flashlights.

We further find that the respective goods would be found in the same channels of trade and encountered by the same purchasers. There is no dispute and the record establishes that Mag Instrument's flashlight bulbs and Brinkmann's flashlights and spotlights are capable of being sold to the same consumers and by the same retail stores.

Accordingly, the *du Pont* factors involving the similarity of the goods, trade channels and classes of purchasers are all factors that weigh in favor of Mag Instrument and for finding a likelihood of confusion.

The parties have argued about the intent of Brinkmann in seeking registration of the MAGNUM MAXFIRE mark for portable hand-held spotlights and flashlights. Based on the evidence, and on Brinkmann's existing registrations for the marks MAGNUM MAX for spotlights and MAXFIRE for flashlights, we cannot infer any bad faith on the part of Brinkmann in seeking to register the mark MAGNUM MAXFIRE. In any event, demonstrating bad faith is certainly not necessary to a finding of likelihood of confusion. *See J & J Snack Foods Corp. v. McDonald's Corp.,* 932 F.2d 1460, 18 USPQ2d 1889,

27

1891 (Fed. Cir. 1991) ("Whether there is evidence of intent to trade on the goodwill of another is a factor to be considered, but the absence of such evidence does not avoid a ruling of likelihood of confusion.") Likewise, evidence on applicant's behalf that it is seeking to register the mark in good faith does very little to obviate a finding of a likelihood of confusion because it is expected that applicants are acting in good faith. Accordingly, the issue involving Brinkmann's intentions in filing the subject application is not a significant factor in our likelihood of confusion analysis.

Brinkmann also argues that "[d]espite the ample opportunities for actual consumer confusion [with Mag Instrument's marks], there is no evidence of a <u>single</u> instance of confusion in the <u>25 years</u> of use of MAGNUM MAX by Brinkmann" (emphasis in original) and that "this can only mean that confusion is not likely for Brinkmann's use of the mark MAGNUM MAXFIRE either."[17] Brinkmann relies on evidence showing that the channels of trade and classes of consumers have been the same during those years. Mag Instrument does not contest the lack of evidence of any instances of actual confusion or the opportunity for such confusion during those years, but notes that Brinkmann's prior-registered mark is different from the applied-for mark and was being used on

---

[17] Brinkmann brief (filed April 27, 2009), p. 43.

28

spotlights during all those years whereas the subject application identifies flashlights.

We cannot extrapolate from the lack of evidence of actual confusion between MAGNUM MAX for spotlights and MAG-NUM STAR for flashlight bulbs that there is not likely to be confusion between the latter mark and goods and Brinkmann's new mark and goods. In any event, as often stated, proof of actual confusion is not necessary to establish likelihood of confusion. *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 218 USPQ 390, 396 (Fed. Cir. 1983). "[T]he test under § 1052(d) is likelihood of confusion, not actual confusion." *Herbko Int'l Inc. v. Kappa Books Inc.,* 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002).

On balance, the relevant *du Pont* factors weigh in favor of a finding of likelihood of confusion. We conclude that consumers familiar with Mag Instrument's flashlight bulbs sold under the mark MAG-NUM STAR, upon encountering applicant's mark MAGNUM MAXFIRE on portable hand-held spotlights and flashlights, would be likely to believe that the goods originate from or are associated with or sponsored by the same entity.

In view thereof, we sustain this opposition on the ground of priority and likelihood of confusion.

* * *

**Opposition No. 91164340 (MAG STAR)**

29

In this opposition, Brinkmann opposes Mag Instrument's application to register the mark MAG STAR on the Principal Register for the already identified flashlights as well as related parts and accessories in classes 9 and 11, on the ground of likelihood of confusion. Brinkmann essentially bases the opposition on an allegation that it has prior use of the registered mark, MAXSTAR, for "electric lanterns," and Mag Instrument's applied-for mark is confusingly similar to it.

Brinkmann's standing, as discussed previously, has been established. We therefore turn to priority and the merits of the likelihood of confusion claim.

Priority

Brinkmann's pleaded registration for the MAXSTAR mark is of record, unchallenged, and therefore priority is not in issue. *King Candy Co.,* supra.

Likelihood of Confusion

Keeping in mind the already-recited likelihood of confusion principles, we again make our determination in this opposition proceeding based on consideration of all probative facts in evidence that are relevant to the *du Pont* factors.

As to the marks at issue, Brinkmann's MAXSTAR versus Mag Instrument's MAG STAR, there are obvious similarities in appearance and sound. Both marks have two syllables that

begin with the letters "MA" followed by another single letter and end with "star." Visually, the only real difference is the third letter in each mark, "g" and "x" respectively. *See Hercules v. National Starch,* 223 USPQ 1244, 1246 (TTAB 1984) (NATROSOL and NATROL found similar because "the clearly dominant aspect of both marks is that the first four letters and the final two are the same"). The presence or absence of a space before STAR does very little, if anything, to distinguish the two marks. *Seaguard Corp. v. Seaward International, Inc.*, 223 USPQ 48, 51 (TTAB 1984); *In re Best Western Family Steak House, Inc.*, 222 USPQ 827, 827 (TTAB 1984); and *Gastown Inc. of Delaware v. Gas City, Ltd.*, 187 USPQ 760 (TTAB 1975). In terms of sound, the two marks are also very similar and, but for a speaker enunciating the first syllable slowly, it is very likely that a consumer will confuse the two marks upon hearing them spoken.

We find that no specific connotation or commercial impression can be attributed to either mark. In the context of both parties' goods, the common element, STAR, may suggest brilliant light. We agree with applicant, and Brinkmann recognizes as well, that the MAX portion of Brinkmann's mark may be understood as an abbreviation of "maximum." Thus, when paired with the term "star," there is no identifiable meaning other than that of a strong or large

31

star; this, in turn, does not really change the suggestion of brilliant light imparted by the term "star" but merely enhances it.

Mag Instrument's argument that "consumers would understand [the MAG element of its mark] to connote a product of Mag Instrument" based on Mag Instrument's asserted ownership of a family of marks containing the "MAG" element is not persuasive.[18]  First, it has long been held that the family of marks doctrine is unavailable to a defendant as a defense in an *inter partes* proceeding.  *See, e.g., Baroid Drilling Fluids Inc. v. Sun Drilling Products*, 24 USPQ2d 1048 (TTAB 1992).  And, to the extent that Mag Instrument contends that "Mag" will be understood by consumers as Mag Instrument's house mark, we cannot conclude based on the evidence of record that this would be the case.  Moreover, the case referenced by Mag Instrument in support of its argument that the common STAR element of the respective marks is weak and the overall marks can be distinguished based on their other elements, is readily distinguished on its facts.  In that case, the Board held applicant's NORTON MCNAUGHTON ESSENTIALS for women's clothing to not be confusingly similar to ESSENTIALS for similar goods.  *Knight Textile Corp. v. Jones Investment Co.*, 75 USPQ2d 1313 (TTAB 2005).  The Board based its

---

[18] Mag Instrument brief (filed May 27, 2009), p. 32.

decision, in large part, on a finding that the term "essentials" is a highly suggestive term in connection with clothing.[19]  Here, we do not have evidence that STAR is so highly suggestive or otherwise so weak for the involved goods that the elements MAG and MAX in the respective marks would be sufficient to distinguish the overall marks.  Also, in *Knight Textile*, the added (and dominant element) in applicant's mark, NORTON MCNAUGHTON, was completely different from any element in the opposer's mark.  Here, even if we were to accept Mag Instrument's contention that the "Mag" element would be perceived as a Mag Instrument house mark, it remains that the two marks, MAG STAR and MAXSTAR, are very similar in appearance and sound.  Any possible difference in connotation is outweighed by the very close appearance and sound of the marks.

Overall, we find the marks MAXSTAR and MAG STAR are very similar and this factor favors Brinkmann.

As to the relatedness of the identified goods, namely, Mag Instrument's flashlights and related parts and accessories versus Brinkmann's electric lanterns, there does not appear to be any dispute that these goods are found in the same trade channels and sold to the same classes of consumers.  The parties attend some of the very same trade

---

[19] In *Knight Textile*, the Board relied primarily on a dictionary definition for "essential-s" and "twenty-three extant ESSENTIAL

33

shows to promote the identified goods; the goods are sold through the same type of retail stores, if not the very same, such as large retail home improvement centers or hardware stores; and the goods are purchased by the same classes of consumers.[20]  As to the nature of the identified goods, the electric lanterns are akin to flashlights inasmuch as they are both handheld lighting devices and can be used in a household setting or for professional and commercial use.  Indeed, Brinkmann submitted evidence that it markets flashlights and electric lanterns in "combo" packages for retail sale.

While there may be a different utilitarian purpose to an electric lantern vis-à-vis a flashlight, these goods are clearly related.  The evidence also shows that many of the same types of accessories and replacement parts, e.g., power adapters, lamps (bulbs), etc. are marketed in connection with electric lanterns and flashlights.  Ultimately, we find the goods to be related.

In view of the above, the *du Pont* factors involving the similarity of the goods, trade channels and classes of purchasers are all factors that weigh in favor of Brinkmann and for finding a likelihood of confusion.

---

registrations on the register in the clothing field registered to twenty-one different owners." *Knight Textile*, 75 USPQ2d at 1316.
[20] Specific examples are not provided due to much of the testimony and exhibits regarding trade channels and customers having been designated "confidential."

Mag Instrument argues that there is no likelihood of confusion because it has extensively used similar marks (MAG-NUM STAR and WHITE STAR) on flashlights and related parts/accessories without any known instances of actual confusion between those marks and Brinkmann's use of MAXSTAR on electric lanterns. Mag Instrument also argues that it acted in good faith in its adoption of the MAG STAR mark and in seeking registration thereof. For similar reasons mentioned in this decision in relation to Opposition No. 91163534, these arguments have very little, if any, persuasive value in our likelihood of confusion analysis in this opposition proceeding. Specifically, MAG STAR is different from the marks that Mag Instrument relies upon in asserting no previous instances of actual confusion. And, as to Mag Instrument's intentions, it is expected that applicants are acting in good faith.

In sum, the relevant *du Pont* factors weigh in favor of a finding of likelihood of confusion. We conclude that consumers familiar with Brinkmann's electric lanterns sold under the registered mark MAXSTAR, upon encountering applicant's mark MAG STAR on the identified electric flashlights, as well as parts and accessories therefor, are likely to believe that the goods originate from or are associated with or sponsored by the same entity.

In view thereof, we sustain this opposition on the ground of priority and likelihood of confusion.

**\* \* \***

**Opposition No. 91164169 (the 'dual band' mark)**

As already noted, this opposition involves Mag Instrument's proposed dual band design mark, registration of which Brinkmann has opposed on the grounds that the mark is functional and, in the event the mark is found not to be functional, that it has not acquired distinctiveness.

The "Dual Band" Mark

The description of the mark at issue and its depiction (as shown on the drawing page of the application) are:



The mark consists of two bands that encircle the barrel of the flashlight.  The outline of the flashlight is not part of the mark but is merely intended to show the position of the mark.

In their briefs, however, the parties argue to some extent as to what constitutes the applied-for mark. Essentially, Mag Instrument argues that its mark must be construed as consisting of two bands that are visibly contrasting from the rest of the flashlight; Brinkmann, on the other hand, argues that the mark simply consists of any two bands without any further limitations because whether

(or how) the bands contrast with the rest of the flashlight

is not mentioned in the application.  While we do not

believe this is necessarily an outcome determinative issue,

it does warrant some explanation.

Trademark Rule 2.35, 37 CFR 2.35, permits an applicant

to submit a description of a mark that must be acceptable to

the Examining Attorney.  Rule 2.35 also permits the

Examining Attorney to require a description of the mark and,

to this extent, Sections 808.02 and 808.03 of the *Trademark*

*Manual of Examining Procedure* state the following:

> If a description of a mark is placed in the record, its
> form must be satisfactory to the examining attorney.
> To be satisfactory, the description should state
> accurately what the mark comprises, and should not
> create a misleading impression by either positive
> statement or omission of facts.
> …
> The examining attorney should require a description of
> the mark where the mark is three-dimensional, where the
> mark is a configuration of the goods or packaging,
> where the drawing includes dotted lines to indicate a
> portion of the product or packaging which is not part
> of the mark, and in similar cases. … If applicable, the
> description statement must clearly indicate the portion
> of the product or container that the mark comprises and
> what the dotted lines on the drawing represent.

As regards the subject application, the examining

attorney accepted applicant's proffered description of the

mark as well as the drawing depicting the mark.  We

therefore find ourselves in agreement with Brinkmann that

Mag Instrument's applied-for mark is as it is depicted on

the drawing page and described in the subject application,

that is, "two bands that encircle the barrel of the

37

flashlight." The drawing only shows the placement or location of the two bands. There is no indication in the application that the two bands contrast with the barrel of the flashlight.

Mag Instrument contends that "something must be perceptible to be a trademark" and cites to Professor McCarthy's statement that "anything that can be detected by one of the human senses should be eligible for protection as a trademark if it is used to distinguish a source of goods or services." Brief, p. 2 (citation omitted). We find no fault with the premise that a mark must be perceived by consumers in order for it to act as a trademark. Nevertheless, the application is devoid of any indication as to how the two bands will contrast, *e.g.*, lining for colors in the drawing. Nor does the description even state that they are contrasting, either with each other or the flashlight body. While it stands to reason that the two bands are more likely to be noticed by someone viewing the goods if they appear in a color that sharply contrasts with the body of the flashlight, the possibility remains that the two bands may be the same and may color-match the body of the rest of the flashlight, differing perhaps only in texture, and may thus require more subtle perception.

Functionality

38

Brinkmann argues that Mag Instrument's proposed mark is functional because the mark represents a design that is "necessary to charge the flashlight and the reason that the charging feature works." Brief, p. 10. Furthermore, "[t]he circumferential design of [the mark] is functionally advantageous because the two charging bands provide a continuous surface area encircling the barrel of the flashlight." *Id.* Brinkmann concludes that "the very essence of the Mag Charger flashlight's recharging capability is through the Dual Band Design, that is, the charging bands, and the circumferential nature of the charging bands only adds to the functional advantage of the Mag Charger flashlight." *Id.* at 12-13.

Mag Instrument, on the other hand, contends that "the application's description must be read to require, *by necessary implication*, that the two bands be in visible contrast to the flashlight barrel they encircle" and that "there is no functional reason why barrel-encircling bands on a flashlight must appear as two visibly separate and contrasting bands." Brief, p. 3 (*emphasis* in original). According to Mag Instrument, there is "no reason why the Mag Charger flashlight's two silvery bands must be silvery in color, or why they must be of any color that contrasts with the barrel, in order to serve their function, which is to act as the electrical contacts." Brief, p. 5. Mag

39

Instrument further argues that Brinkmann's functionality opposition is limited to only a subset of Mag Instrument's flashlights, namely, those with internally-rechargeable batteries.[21]

Mag Instrument's only asserted use of the mark has been on its rechargeable flashlights sold under the mark, MAG CHARGER. The MAG CHARGER flashlight, which is in the record as an exhibit, indeed possesses two clearly visible bands that are silver-metallic in appearance, located in the same position as that represented in the application's drawing of the mark. The two bands also clearly contrast with the remainder of the flashlight, which is nearly all black. Upon close inspection of the Mag Charger flashlight, and based on the testimony of the witnesses who have authenticated the exhibit, it is evident that the two silver, metallic bands are the result of three separate annular rings in conjunction with what has been referred to as a "pseudo band" (an annular or ring-like area of the barrel of the flashlight that lacks the black anodized coating). Specifically, there is a silver-metallic colored ring or band that acts as the positive electrode contact for the recharging system. On either side of this positive

---

[21] The identification of goods simply recites "flashlights" and thus must be read to include rechargeable flashlights. And, in general, if a proposed mark is functional for any goods encompassed by the identification, the proposed mark is considered functional and must be refused accordingly.

electrode ring are two thinner black insulator rings.  On the other side of one of the insulator rings is the "pseudo band," which is merely a portion of the barrel of the flashlight that corresponds in size to the positive electrode ring.  This pseudo band, upon casual glance, appears identical to the positive electrode ring because it lacks the black anodized coating applied to the remainder of the flashlight barrel.  The second "pseudo band" also acts as the negative electrode that completes the charging circuit when the flashlight is placed in a charging cradle.

Section 2(e)(5) of the Trademark Act precludes registration of "any matter that, as a whole, is functional."  The Supreme Court has clarified that a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article."  *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 214 USPQ 1, 4 n.10 (1982).  The Supreme Court has called this "*Inwood* formulation" the "traditional rule" of functionality.  *TrafFix Devices Inc. v. Marketing Displays Inc.*, 532 U.S. 23, 58 USPQ2d 1001, 1006 (2001).

"The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature."

41

*Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 34 USPQ2d 1161, 1163 (1995); *see also In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 213 USPQ 9, 12 (CCPA 1982) ("This requirement of 'nonfunctionality'...has as its genesis the judicial theory that there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws.").

In considering the issue of functionality, we consider the following (known as the *Morton-Norwich* factors): (1) the existence of a utility patent disclosing the utilitarian advantages of the design; (2) advertising materials in which the originator of the design touts the design's utilitarian advantages; (3) the availability to competitors of functionally equivalent designs; and (4) facts indicating that the design results in a comparatively simple or cheap method of manufacturing the product. *Valu Engineering Inc. v. Rexnord Corp.*, 278 F.3d 1268, 61 USPQ2d 1422, 1426 (Fed. Cir. 2002), citing *In re Morton-Norwich*, 671 F.2d at 1333, 213 USPQ at 15-16.

As to the first *Morton-Norwich* factor involving the existence of any utility patent disclosing the utilitarian advantages of the design, the Supreme Court has addressed what evidentiary value this is to be accorded in the analysis:

A prior patent, we conclude, has vital significance in resolving the trade dress claim.  A utility patent is strong evidence that the features claimed therein are functional...  Where the expired patent claimed the features in question, one who seeks to establish trade dress protection must carry the heavy burden of showing that the feature is not functional, for instance by showing that it is merely an ornamental, incidental, or arbitrary aspect of the device.

*TrafFix Devices Inc. v. Marketing Displays Inc.,* 58 USPQ2d at 1005.[22]

We are not limited to review of the claims in a patent in determining functionality, but we may also consider the disclosures in the patent.  See *In re Bose*, 772 F.2d 866, 227 USPQ 1 (Fed. Cir. 1985); and *In re Howard Leight Industries LLC*, 80 USPQ2d 1507, 1511 (TTAB 2006).

Of importance in this case is expired U.S. Patent No. 4,388,673 ("patent '673") for a "Variable Light Beam

---

[22]  In their briefs, the parties argue the relevance (or lack thereof) of the other *Morton-Norwich* factors in light of the *TrafFix* decision.  In this regard, the Federal Circuit has stated "[w]e do not understand the Supreme Court's decision in *TrafFix* to have altered the *Morton-Norwich* analysis."  *Valu Engineering,* 61 USPQ2d at 1427.  And, as to the role of alternative designs:
Nothing in *TrafFix* suggests that consideration of alternative designs is not properly a part of the overall mix, and we do not read the Court's observations in *TrafFix* as rendering the availability of alternative designs irrelevant.  Rather, we conclude that the Court merely noted that once a product feature is found functional based on other considerations, there is no need to consider the availability of alternative designs because the feature cannot be given trade dress protection merely because there are alternative designs available.  But that does not mean that the availability of alternative designs cannot be a legitimate source of evidence to determine whether a feature is functional in the first place.
*Valu Engineering,* 61 USPQ2d at 1428.

Flashlight and Recharging Unit."[23]  This utility patent issued to Mag Instrument's principal, Anthony Maglica, and subsequently was assigned to Mag Instrument.  The flashlight is described in the patent Abstract as "includ[ing] structural means for recharging its battery; and a battery charger/flashlight holder is designed to retain the flashlight and charge the batteries when the flashlight is stored therein."

Two drawings (Figures 1 and 3) from patent '673 show the flashlight and charger as follows:



_FIG. 1._

---

[23] Introduced as Exhibit B-46, U.S. Patent No. 4,388,673 issued on June 14, 1983.



Figure 1 is described as depicting "a side elevation view of the exterior of a flashlight constructed in accordance with the teachings of the present invention." Figure 3 is described as depicting "a perspective view of a flashlight holder/battery charger constructed in accordance with the teachings of the present invention, with the forward portion of the flashlight of FIG. 1 shown in phantom lines."

It is readily apparent from the two drawings in the patent that the two bands in applicant's proposed mark are positioned on a flashlight (pursuant to that shown in the application's drawing page) in the same location as parts 98, 100, 102 and 104 in patent '673. In the patent, this section of the flashlight is described as comprising:

A pair of mating, spaced annular insulating rings **98**, **100** are disposed between the rear end of the switch housing **40** and an annular flange **102** on the tubular member **96**. The annular insulating rings **98** and **100** retain an annular contact member **104**. The annular flange **102** and annular contact member **104** are adapted to be placed in electrical contact with contact members of a battery charger.

One of the stated objectives of the invention is "to provide a battery charger/flashlight holder which will accomplish the dual function of storing the flashlight between uses, and maintaining the rechargeable batteries in a fully charged condition." In the summary of the invention, further explanation is provided:

The flashlight of the present invention further includes an electric circuit having a diode between a first external contact and an internal conductor, the internal conductor being electrically connected to batteries in the flashlight casing when the batteries are in place. The flashlight electric circuit further includes a ground connection, including a second external contact, and an internal ground connection. The first and second external contacts on the flashlight are adapted to be in electrical contact with the contacts of a battery charger in the bracket of a flashlight holder. The contacts of the charger are selectively connected to a source of alternating current. The holder may be mounted, for example, on the dashboard of an automobile. The battery charger may be powered, for example, by the alternator of the automobile.

As to the claims in expired patent '673, we note the following:

1. In combination:
a flashlight and a charger therefor;
said flashlight including a conductive strip member and a battery compartment; conductive means extending between said strip and said compartment for establishing electrical connection between said strip

46

and battery in said compartment for charging the
battery;
and a charger including a contact member for
electrically contacting the said strip; and means for
connecting said contact member to a source of
electrical energy.

**2**. The combination according to claim 1, wherein said
strip on said flashlight comprises a circumferential
ring; and wherein said charger includes means for
retaining said flashlight such that said
circumferential strip contacts said contact member.

...

**6**. A battery charger and holder mechanism including:
a head portion for receiving the head of a flashlight
and a neck portion for receiving a portion of the
flashlight below the head portion of the flashlight;
and electrical means in said holder for supplying
electrical energy to batteries in the flashlight when
the flashlight is in the charger/holder.

Upon review of the '673 patent, it is evident that the

features of Mag Instrument's applied-for mark, i.e., the

positioning of two bands just below the head of the

flashlight, are fundamentally covered by the expired patent.

That is, the features of the applied-for mark, namely two

evenly-sized bands positioned below the head of a

flashlight, are represented in the patent as two

circumferential and annular rings or flanges (identified as

parts "102" and "104") in the same location on the

flashlight as that shown.  In comparing the patent to the

Mag Charger flashlight, we do note slight differences, e.g.,

the patent describes and shows a "flanged" annular ring

(part "102") and the second ring (part "104") is an

independent part (as opposed to resulting from the absence

47

of the black anodized coating that is on the remainder of the barrel of the flashlight).  In spite of the differences, the fact remains that the two bands represented in applicant's mark also represent two annular rings that are essential to the battery recharging system of the flashlight.  Ultimately, we find that this patent defines and discloses the utilitarian advantages of the underlying mark, i.e., the two bands.  And, as explained in the patent's second claim, the fact that the bands are circumferential provides a means for the flashlight's charging cradle to "retain[] said flashlight such that said circumferential strip [the band or flanged ring] contacts said contact member."

We turn now to the second Morton-Norwich factor regarding any advertising materials in which the applicant touts the design's utilitarian advantages.  The record in this case indeed shows that Mag Instrument, in advertisements and other materials prepared by Mag Instrument for the MAG CHARGER flashlight, points out several advantages to the dual bands and their ability to maintain contact for purposes of recharging based on their circumferential design.  For example, in an advertisement headlined "**Mag**nificent!  The rechargeable flashlight that beats all," there is the following:

> The heart of the charging system is the charger module (the 2 silver rings, just below the switch).  For the

48

first time, you can get 360˚ positive contact...*no matter how you place the flashlight in the charger.*

(*Emphasis* in original).[24]

Another advertisement for the Mag Charger flashlight extols the advantages of the dual bands with the charging cradle, "Charging Ring Module – Flashlight can be charged in any position. No matter how you place the flashlight in the Charging Cradle...it's on."[25] And several other advertisements or product information for the MAG CHARGER emphasize the advantage of having "360 degree" charging contact between the two bands and the charging cradle.

Mag Instrument argues that these advertisements are "irrelevant" because they do not tout the contrasting nature of the two bands and that Brinkmann "can point to nothing in any of Mag Instrument's literature that has ever touted any utilitarian advantage in having the bands visibly contrast with the barrel [of the flashlight]." Brief, p. 14. Again, Mag Instrument is essentially attempting to portray the applied-for mark as merely two contrasting bands, even though the application is not so limited. However, as discussed in the context of patent '673 and as demonstrated by applicant's own use on the MAG CHARGER flashlight, the two bands are not mere ornamentation, regardless of whether they contrast with the barrel of the flashlight. The

---

[24] Exhibit M112.
[25] Exhibit B25.

49

utilitarian function of the two bands is that they act as positive and negative points of contact for the battery's recharging system when the flashlight is placed in the charging cradle. The "360 degree" contact, created by the circumferential nature of the bands, permits users to place the flashlight in the charging cradle without having to check if the contact points have been met. Thus, contrary to applicant's assertions, the Mag Instrument advertisements and product literature are extremely relevant because they demonstrate applicant's efforts in emphasizing or touting this feature.

As for the Morton Norwich factor of the availability of alternative designs, Mag Instrument submitted the testimony of its expert, Martin J. Siegel, in support of its position that there are other designs that are functionally equivalent to the two bands. In addition, Messrs. Maglica and Hawthorn testified to some extent as to possible alternative rechargeable flashlight designs. Because much of the testimony of the witnesses has been designated as "confidential" or involving "trade secret/commercially sensitive" exhibits, we do not discuss the evidence in detail, but we do note that there are some general, discernable deficiencies in the aforementioned testimony and evidence. First, many of the witnesses' proposed alternative designs are not described as definitively

feasible in application.  Rather, they are described in a hypothetical fashion.  For example, Mag Instrument has proposed an alternative design involving (electromagnetic) inductive charging without any evidence that such technology has been (or can be) used in a comparable manner on flashlights.  Second, Messrs. Siegel and Hawthorn were not able to definitively state whether or not third parties were truly free to use several of the proposed alternative designs or whether Mag Instrument would consider said designs as infringing upon its purported rights in the applied-for mark.  Certainly, for us to consider any design as a possible alternative to the utilitarian function of the applied-for mark, it must be available for third parties to use.  Third, the majority of the proposed alternative designs do not appear to be functionally equivalent to that of the applied-for design; that is, they lack the "360 degree" feature or otherwise do not permit users to easily and conveniently place the flashlight in a recharging cradle or mode.

Mag Instrument places great emphasis on a suggestion that is not an alternative design but would involve the use of color-matching charging rings on a flashlight in the same location as the dual band mark.  According to Mag Instrument, this would result in a flashlight having rings that "would not be in visual contrast with the barrel [of

51

the flashlight], and would not infringe the [applied-for mark]." Brief, p. 15. Mag Instrument also contends that there is "no functional reason why the rings and the barrel cannot be color-matched" and that doing this will not degrade the function or "materially increase the cost." Id. In spite of Mag Instrument's assurances that such use would not "infringe" upon the applied-for mark, we do not agree that this is necessarily an alternative to the utilitarian design of applicant's dual band mark. Rather, the suggested use is merely a manner in which others can possibly mask or hide the utilitarian advantage of the dual band mark. Furthermore, as noted, Mag Instrument's application is not limited to bands that contrast and therefore includes bands that would not. Mag Instrument's proposed alternative design may be something of a variation to the present embodiment in the marketplace but it is not a legally cognizable alternative to the dual band mark, as specified in the application.

Finally, as to the last Morton-Norwich factor, we are unable to conclude whether the dual band design results in an easier or less expensive manner of production of the flashlight. Brinkmann has pointed to the following language in the '673 patent:

> The broad object of the present invention is to provide
> a flashlight wherein the intensity and cross-sectional
> area of the light beam may be selectively varied in an

52

improved manner, and **wherein the flashlight structure is simpler and less expensive to manufacture**.

[Emphasis in **bold** added.]

However, as Mag Instrument pointed out, the "less expensive to manufacture" language does not relate specifically to the dual band design.

Mag Instrument, on the other hand, argues that the MAG CHARGER flashlight contains recharging related components that are made and assembled "far from the simplest and least expensive way." In support, it relies on the testimony of Gus Hawthorn who states that the flashlights are hand-assembled and that this is more expensive than an automated assembly. However, Mr. Hawthorn did not specifically attribute the reason for hand-assembly to the dual band or recharging ring design. Moreover, he testified that the switch assembly, in particular, was hand-assembled and, upon review of the flashlight, it is evident that assembly of this part would be the most labor intensive.

Upon review of all evidence and arguments in relation to the Morton-Norwich factors, we are convinced that Mag Instrument's proposed mark is functional. Even if we were to allow that it may be possible for others to devise alternative designs that are as equally functional as Mag Instrument's dual band recharging system, we do not believe that this obviates the overall functionality of applicant's mark. The facts that a utility patent describes the useful

purpose of the dual bands and that Mag Instrument clearly touts the advantages of these dual bands simply outweigh the possibility that there may be similar alternative designs available to competitors.

In sum, we find that applicant's proposed mark is functional and, thus, is not registrable.

Although we have found Mag Instrument's dual band mark functional, we note that Brinkmann alternatively argued that the mark should be refused registration because it has not acquired distinctiveness. For completeness of our decision, we discuss the alternative claim below.

### Acquired Distinctiveness

When a mark is proposed for registration under Section 2(f) and is approved by the USPTO for publication, as is what happened with Mag Instrument's dual band mark, there is a presumption that the examining attorney found that the applicant made a prima facie showing of acquired distinctiveness. *Yamaha International Corp. v. Hoshino Gakki Co.*, 840 F.2d 1571, 6 USPQ2d 1001, 1004 (Fed. Cir. 1988). And, when the same mark is challenged in an *inter partes* proceeding such as this opposition, it is the plaintiff that has the initial burden to establish prima facie that the applicant did not satisfy the acquired distinctiveness requirement of Section 2(f). *Id.*, 6 USPQ2d at 1005. The plaintiff may meet this initial burden if it

produces "sufficient evidence or argument whereby, on the entire record then before the board, the board could conclude that the applicant has not met its ultimate burden of showing acquired distinctiveness." *Id.* As further explained in *Yamaha*, "[I]f the [plaintiff] does present its prima facie case challenging the sufficiency of [defendant's] proof of acquired distinctiveness, the [defendant] may then find it necessary to present additional evidence and argument to rebut or overcome the [plaintiff's] showing." *Id.* See *Duramax Marine LLC v. R.W. Fernstrum & Co,* 80 USPQ2d 1780 (TTAB 2006).

Upon review of all of the evidence and arguments in this case, we find that Brinkmann has met its initial burden in challenging the acquired distinctiveness evidence submitted by Mag Instrument during the prosecution of its application. Moreover, Mag Instrument has not overcome this by ultimately establishing that its mark has acquired distinctiveness.

The evidence submitted by Mag Instrument during the prosecution of its application was in response to an ornamentation refusal based on the examining attorney's contention that "the public would perceive the proposed mark merely as a decorative or ornamental feature of the goods and not as an indicator [of source]." Office Action, July 10, 2003. In its response to this refusal, Mag Instrument

submitted: a declaration from Mr. Zecchini, promotional material for Mag Instrument's flashlights and other goods, and copies of sixteen declarations from Mag Instrument's sales representatives as well as employees or owners of third-party flashlight resellers.

As discussed previously in this decision, Brinkmann has demonstrated that the two bands constituting applicant's mark are not merely ornamental in nature, but they represent two charging rings used for recharging the flashlight's internal battery. That is, in contrast to the examining attorney's refusal based on consumers perceiving the bands as merely two ornamental stripes on the barrel of a flashlight, Brinkmann has shown that the two bands actually have a function and, in essence, represent the configuration of the recharging rings of the flashlight. Based on the entire record, including Mag Instrument's own advertisements of the MAG CHARGER flashlight illustrating the rings and their function, we find that consumers will view the dual bands on the flashlights as simply a non-distinctive placement of the recharging rings which has not acquired distinctiveness as a mark.

Mag Instrument has not demonstrated by at least a preponderance of the evidence that the proposed mark has acquired distinctiveness. Because the proposed mark is essentially a configuration of the recharging rings element

of the flashlights, Mag Instrument had to show that the primary significance of the two bands or recharging rings in the minds of consumers is not the utilitarian parts of the flashlight but the source of that flashlight, in order to establish acquired distinctiveness.  See *In re Steelbuilding.com*, 415 F.3d 1293, 75 USPQ2d 1420, 1422 (Fed. Cir. 2005); *In re Ennco Display Systems Inc.*, 56 USPQ2d 1279 (TTAB 2000).

Turning to the direct evidence of acquired distinctiveness, the sixteen declarations submitted by Mag Instrument during the prosecution of the application to show that the dual band mark has acquired distinctiveness have little persuasive value.  They are nearly identical in wording and thus do not appear to have been prepared in the signer's own words.  There is no evidence to suggest that this was a random selection of possible declarants.  More importantly, none of the declarants, except possibly one, is described as an end consumer.  They are almost exclusively either Mag Instrument's sales representatives or otherwise associated with a company in the flashlight retail business.

Mag Instrument also relies heavily on circumstantial evidence to show that the dual band mark has acquired distinctiveness.  Specifically, it points to twenty-seven years of use of the dual bands on the MAG CHARGER flashlight, as well as substantial sales and advertising for

the MAG CHARGER flashlights.  With respect to Mag Instrument's length of use, it is true that evidence of substantially exclusive use for a number of years may be considered as evidence of acquired distinctiveness.  However, the weight to be accorded this kind of evidence depends on the facts and circumstances of the particular case.  *See Yamaha*, 840 F.2d at 1576, 6 USPQ2d at 1004.  Here, we find Mag Instrument's years of use to be simply insufficient, in itself or in conjunction with the other evidence of record, to show that the dual bands have acquired distinctiveness.

As to Mag Instrument's evidence regarding sales and advertising of the MAG CHARGER flashlight, the exact numbers remain confidential, but we acknowledge that the sales figures (including revenue and units sold) as well as advertisement expenditures, have been substantial and are impressive.  Nevertheless, as often stated, a successful advertising campaign is not in itself necessarily enough to prove secondary meaning.  *In re Boston Beer Co. L.P.*, 198 F.3d 1370, 53 USPQ2d 1056 (Fed. Cir. 1999) (claim based on annual sales under the mark of approximately eighty-five million dollars, and annual advertising expenditures in excess of ten million dollars, not sufficient to establish acquired distinctiveness in view of highly descriptive nature of mark); *Braun Inc. v. Dynamics Corp.*, 975 F.2d 815,

827, 24 USPQ2d 1121, 1133 (Fed. Cir. 1992) ("[L]arge consumer demand for Braun's blender does not permit a finding the public necessarily associated the blender design with Braun."); *In re Bongrain Int'l (American) Corp.*, 894 F.2d 1316, 1318, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may be indicative of popularity of product itself rather than recognition as denoting origin). Here, the sales and advertising figures fail to reflect public reaction to the dual bands as a source indicator for applicant's flashlights.

Moreover, and perhaps most damaging to Mag Instrument's attempt to demonstrate acquired distinctiveness of the proposed mark, is what is noticeably absent from the record. There is no evidence that Mag Instrument ever placed any "look for" advertisements or otherwise made promotional efforts to create consumer association between the dual bands, or recharging rings, with the source of the flashlights.[26] The Board and other courts have long taken notice of the importance of such advertisements in regard to configuration or product design marks. See *Duraco Prods. Inc. v. Joy Plastic Enter., Ltd.*, 40 F.3d 1431, 1451, 32

---

[26] Mag Instrument's claim that the dual band design "is a trademark of Mag Instrument, Inc." in an instruction manual for the MAG CHARGER flashlight (Exh. B-48) hardly constitutes "look for" advertising. Presumably, consumers would not even see this small print claim unless they have already purchased the flashlight.

USPQ2d 1724, 1741 (3d Cir. 1994) (advertising expenditures "measured primarily with regard to those advertisements which highlight the supposedly distinctive, identifying feature" of the product configuration); see also, *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 662, 36 USPQ2d 1065, 1071-72 (7th Cir. 1995) (advertising "look for the oval head" for cable ties encourages consumers to identify the claimed trade dress with the particular producer); *First Brands Corp. v. Fred Meyer Inc.*, 809 F.2d 1378, 1383, 1 USPQ2d 1779, 1782 (9th Cir. 1987) ("[A]dvertising campaign has not stressed the color and shape of the antifreeze jug so as to support an inference of secondary meaning."); *Seabrook Foods, Inc. v. Bar-Well Foods, Ltd.*, 568 F.2d 1342, 1345 n. 8, 196 USPQ 289, 291 n. 8 (CCPA 1977) (advertising emphasizing design portion of the mark to potential customers is persuasive evidence of acquired distinctiveness). Clearly, the recharging rings were highlighted in several of Mag Instrument's advertisements; however, as previously discussed, it was their utilitarian purpose or advantage that they give the MAG CHARGER flashlight that was being touted. We cannot conclude that such advertisements amount to an attempt to have consumers view the proposed mark as indicating the source of the goods.

Accordingly, based upon consideration of all the evidence in the record, we find that Mag Instrument has failed to establish that the dual band mark has acquired distinctiveness.

In view of the above, this opposition is sustained.

**Decisions:** Oppositions Nos. 91163534 and 91164340 involving claims of likelihood of confusion each are sustained.

Opposition No. 91164169 is sustained on the ground that Mag Instrument's proposed mark is functional, and is therefore not entitled to registration under Section 2(e)(5). In the event that Mag Instrument's proposed mark should be determined to not be functional in any appeal of this decision, we further find the mark has not acquired distinctiveness and is not entitled to registration under Section 2(f).