## THIS OPINION IS A PRECEDENT OF THE TTAB

Mailed:
November 23, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Chevron Intellectual Property Group LLC
_____

Serial No. 78490836
_____

Fred W. Hathaway and Bryce J. Maynard of Buchanan Ingersoll & Rooney PC for Chevron Intellectual Property Group LLC.

Odessa Bibbins, Trademark Examining Attorney, Law Office 105 (Thomas G. Howell, Managing Attorney).
_____

Before Walters, Zervas and Bergsman,
Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Chevron Intellectual Property Group LLC ("applicant") filed a use-based application to register the design of "a stylized pole spanner sign," shown below, for "vehicle service station services and automobile maintenance and repair services," in Class 37.



Serial No. 78490836

Applicant amended the description of its proposed mark to
more specifically identify it as "a beveled pole spanner
sign in the shape of tri-dimensional beam on the top and in
the shape of … a tri-dimensional hexagon on the bottom."
The photograph shown below, from the record, is a clear
representation of the subject matter sought to be
registered.



Applicant claimed ownership of Registration No. 1586096 for
the mark comprising "the word 'Chevron' and a chevron
design affixed to a stylized pole spanner sign" lined for
the color blue, shown below, for the same services.  Though
imperceptible in this illustration, the word CHEVRON

2

appears in small type on the left above the design of a chevron, as in the photo above.



The Examining Attorney refused registration on the grounds that the subject matter sought to be registered is nondistinctive trade dress that does not function as a service mark pursuant to Sections 1, 2, 3 and 45 of the Trademark Act of 1946, 15 U.S.C. §§ 1051-1053 and 1127, and that the design sought to be registered has not acquired distinctiveness, under Section 2(f), 15 U.S.C. § 1052(f). Applicant, on the other hand, contends that the subject matter sought to be registered is inherently distinctive and, in the alternative, has acquired distinctiveness.

A. <u>Whether the subject matter sought to be registered is inherently distinctive</u>?

"[A] mark is inherently distinctive if '[its] intrinsic nature serves to identify a particular source.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 54 USPQ2d 1065, 1068 (2000), *quoting Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 23 USPQ2d 1081, 1083 (1992). It "should be displayed with such prominence as will enable easy recognition" and "the average consumer

will regard it as an unmistakable, certain, and primary means of identification pointing distinctly to the commercial origins of such product." *In re Swift & Co.*, 223 F.2d 950, 106 USPQ 286, 289 (CCPA 1955). "[U]ltimately 'the focus of the [inherent distinctiveness] inquiry is whether or not the trade dress is of such a design that a buyer will immediately rely on it to differentiate the product from those of competing manufacturers; if so, it is inherently distinctive.'" *In re Chippendales USA, Inc.*, No. 2009-1370, slip op. at 9 (Fed. Cir., October 1, 2010), *quoting Tone Brothers, Inc. v. Sysco Corp.*, 28 F.3d 1192, 31 USPQ2d 1321, 1331 (Fed. Cir. 1994).

> In determining whether a design is arbitrary or distinctive [the CCPA] has looked to [1] whether it was a "common" basic shape or design, [2] whether it was unique or unusual in a particular field, [3] whether it was a mere refinement of a commonly-adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods, or [4] whether it was capable of creating a commercial impression distinct from the accompanying words.

*Seabrook Foods, Inc. v. Bar-Well Foods Ltd.*, 568 F.2d 1342, 196 USPQ 289, 291 (CCPA 1977). "A finding that any one of these factors is satisfied may render the mark not

Serial No. 78490836

inherently distinctive." *Chippendales,* slip op. at 8 and 15.

The photographs below display how consumers encounter the pole spanner sign sought to be registered.





The examining attorney contends that the pole spanner sign is a mere refinement of a commonly adopted and well-known form of ornamentation.

> In this case, the mark, a basically horizontal shape, appears with a combination of geometrical shapes configured as a design, similar to signs in (sic) at other service stations, which appear in round or square or other geometric combinations, posted at service stations over the gas pumps, used by vendors to display the name of their goods and/or other information about their services.[1]

To support her position, the examining attorney submitted photographs of pole spanner signs used by other service stations.  Representative samples of the photographs are shown below.






---

[1] Examining Attorney's Brief, unnumbered pages 5-6.

 

Applicant argues to the contrary that its pole spanner design is (1) "a unique, three-dimensional, six-sided beveled shape that is unique to the industry," (2) that "none of [the other] companies utilize a design that is even remotely similar to Applicant's three-dimensional, six-sided shape," (3) that its pole spanner design is not a mere refinement of a commonly adopted shape because its design "is completely different in the base shape, the six sides, and the beveled edges from the basic rectangular designs used for most gas pump spanners," and (4) "the unique shape of Applicant's spanner design creates a separate commercial impression apart from the CHEVRON marks" because it "echoes the outline appearance of its famous Chevron logo … and would do so even without the CHEVRON word mark or logo displayed on the spanner."[2]

---

[2] Applicant's Brief, pp. 5-7.

On appeal, we must consider whether the Examining Attorney has made a *prima facie* case that the subject matter sought to be registered is not inherently distinctive and, if so, whether applicant has submitted sufficient evidence to rebut that *prima facie* case. *In re Pacer Technology,* 338 F.3d 1348, 67 USPQ2d 1629, 1631 (Fed. Cir. 2003). The burden on the Examining Attorney is to establish a "reasonable predicate" for her position that the subject matter is not inherently distinctive. *Id.* The evidence of record illustrating the use of pole spanners by multiple automobile service stations establishes that pole spanners utilize common geometric shapes in the configuration of these signs above gasoline pumps at automobile service stations. Applicant does not dispute that pole spanner designs are commonly used at service stations or that they utilize common geometric shapes; however, alluding to *Seabrook* factor 2, applicant argues that its pole spanner design is unique and visually distinguishable from the spanner designs used by others.[3] Further, alluding to *Seabrook* factor 4, applicant contends that the "six-sided beveled shape" creates a commercial impression separate and apart from any other matter on the pole spanner and that it is so distinctive that consumers

---

[3] Applicant's Brief, pp. 5-6.

will recognize it as a service mark.  However, applicant has not submitted any evidence in support of this latter argument, i.e., that the design sought to be registered creates a distinct commercial impression apart from the words and logo featured on the pole spanner design.

We have considered the record in accordance with each of the factors set forth in *Seabrook* for inherent distinctiveness, and nothing in the record leads us to conclude that consumers would perceive and rely on applicant's pole spanner design as an indication of source absent a showing of acquired distinctiveness.  As shown by the photographs of service stations in the record, prospective consumers would be drawn to service stations by other indicia, such as the use of prominent word marks and logos.  This is equally true of applicant's service stations, which prominently feature its CHEVRON work mark and purportedly famous logo.  As shown by this record, it is common for service stations to use pole spanners in various shapes as part of the gasoline pump configuration, and the spanners typically display word marks or logos. When consumers enter a service station, they will likely perceive the pole spanner designs as part of the gasoline pump, and as a means for displaying word marks and logos; and because the spanners are in common geometric shapes,

they are less likely to stand out as distinctive elements of the overall pump ornamentation. Thus, under the third factor of the *Seabrook* test, we conclude that applicant's "three-dimensional, six-sided beveled shape" is a mere refinement of a commonly used form of a gasoline pump ornamentation rather than an inherently distinctive service mark for automobile service station services. Further, under *Seabrook* factor four, the pole spanner shape is not such that it will create a commercial impression distinct from the CHEVRON word mark and logo.

Finally, we note that applicant is the owner of a previously registered mark incorporating a pole spanner design lined for the color blue that includes the word "Chevron" and a chevron logo. This registration does not help applicant in this case in terms of showing that the applied-for mark is inherently distinctive because the subject matter sought to be registered, devoid of color, words and the logo, is clearly different from the registered mark. Because of these differences in the marks, we cannot conclude, based on the presumption accorded to the prior registration that the mark therein is inherently distinctive that the subject matter in this application is inherently distinctive as well. *See In re Nett Designs, Inc.,* 236 F.3d 1339, 57 USPQ2d 1564, 1566

10

(Fed. Cir. 2001) (each case must be decided on its own merits and "[e]ven if some prior registrations had some characteristics similar to [applicant's] application, the PTO allowance of such prior registrations does not bind the Board or this court").[4]

In view of the foregoing, we find that applicant's customers and prospective customers would be unlikely to immediately regard applicant's pole spanner design as identifying and distinguishing applicant's services and indicating their source. Applicant's record evidence does not counter the Examining Attorney's *prima facie* case that the subject matter sought to be registered is not inherently distinctive.

B. <u>Whether the subject matter sought to be registered has acquired distinctiveness</u>?

The Examining Attorney's position is quite simple: applicant has failed to demonstrate that the subject matter sought to be registered is recognized as a trademark. She contends that, in the evidence of record, "no mention is made of the design or configuration elements, namely, beveled, tri-dimensional hexagon, as the specific features

---

[4] Applicant referenced its prior registration only with respect to its argument that the proposed mark is inherently distinctive and not with respect to the issue of acquired distinctiveness. However, for the reasons articulated above, the prior registration would not help applicant prove that the proposed mark has acquired distinctiveness.

recognized by consumers as the source of applicant's services."[5]

On the other hand, applicant contends that the design sought to be registered has acquired distinctiveness by virtue of the following facts:

1.   Applicant has used its pole spanner design since at least as early as 1988;

2.   Applicant's pole spanner design is used in approximately 8,000 service stations throughout the country; and

3.   Consumers visited applicant's service stations approximately 467 to 667 million times in 2007-2008.

The kind and amount of evidence necessary to establish that a mark has acquired distinctiveness in relation to goods or services depends on the nature of the mark and the circumstances surrounding the use of the mark in each case. *Yamaha Int'l Corp. v. Hoshino Gakki Co. Ltd.*, 840 F.2d 1572, 6 USPQ2d 1001, 1008 (Fed. Cir. 1988) (where the product design sought to be registered was common or ornamental, applicant has an "unusually heavy burden" to show acquired distinctiveness); *In re Owens-Corning Fiberglas Corp.,* 774 F.2d 1116, 227 USPQ 417, 424 (Fed. Cir. 1985)("By their nature color marks carry a difficult

---

[5] Examining Attorney's Brief, unnumbered page 15.

burden in demonstrating distinctiveness and trademark character.  Each case must be considered on its merits");
*In re Water Gremlin Co.,* 635 F.2d 841, 208 USPQ 89, 91 (CCPA 1980)("One who chooses a commonplace design for his package … must expect to have to identify himself as the source of goods by his labelling or some other device").
Because the subject matter sought to be registered is a mere refinement of the commonly used pole spanner design in the automobile service station industry, applicant has a relatively heavy burden for establishing acquired distinctiveness.

Applicant's evidence of acquired distinctiveness is not convincing.  First, applicant's 22 years of use of the design in question is substantial but not necessarily conclusive or persuasive, considering the nature of the subject matter sought to be registered.  *Cf. In re R.M. Smith, Inc.*, 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984) (8 years use was not sufficient evidence of acquired distinctiveness for the configuration of pistol grip water nozzle for water nozzles); *In re Ennco Display Systems Inc.,* 56 USPQ2d 1279, 1286 (TTAB 2000)(applicant's use of the product designs ranging from seven to 17 years is insufficient to bestow acquired distinctiveness); TMEP §1212.05(a)(7th ed. 2010) ("For matter that is not

inherently distinctive because of its nature (e.g.,

nondistinctive product container shapes, overall color of a

product, mere ornamentation, and sounds for goods that make

the sound in their normal course of operation), evidence of

five years' use is not sufficient to show acquired

distinctiveness.. In such a case, actual evidence that the

mark is perceived as a mark for the relevant goods or

services would be required to establish distinctiveness");

*see also In re The Black & Decker Corp.*, 81 USPQ2d 1841,

1843-1844 (TTAB 2006) (applicant successfully established

acquired distinctiveness for the design of a key head for

key blanks and various metal door hardware, where evidence

submitted in support thereof included over eleven years of

use in commerce and significant evidence regarding industry

practice, such that the evidence showed that "it is common

for manufacturers of door hardware to use key head designs

as source indicators…").[6]

Even assuming that applicant's service station

services are highly successful, such success does not, in

and of itself, demonstrate recognition by the purchasing

public of applicant's pole spanner design as a service

---

[6] Even though these cases pertain to product design trade dress, we find that they are equally applicable to cases involving trade dress for services.

mark.  *In re Bongrain International (American) Corp.,* 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) (growth in sales may be indicative of popularity of product itself rather than recognition of a term or design as denoting origin); *Goodyear Tire and Rubber Co. v. Interco Tire Corp.,* 49 USPQ2d 1705, 1720 (TTAB 1998) ("At best, applicant's sales figures may be said to demonstrate a growing degree of popularity or commercial success for its tires, but such evidence does not demonstrate recognition by the purchasing public of its [tire tread design] as a trademark").

Another reason applicant's evidence of acquired distinctiveness is deficient is the absence of advertisements and promotions featuring or promoting recognition of the pole spanner design as a service mark. While the pole spanner design is a feature of applicant's gasoline pump configuration in 8,000 service stations seen by over 500 million people in a two-year period, there is nothing to indicate that applicant's customers view the pole spanner design as anything other than a feature of the gasoline pump, or that applicant has done anything to foster the impression that the pole spanner design is an indication of source.  In this regard, applicant also submitted various articles and other materials regarding

its station image refresh program that it contends indicate consumers recognize and appreciate applicant's pole spanner designs, citing Exhibits B, C, and D attached to the December 30, 2008 response.[7]

Exhibit B is a set of materials distributed to applicant's franchisees or licensees to encourage applicant's renovation program.  The pole spanner is just one element of the upgraded facilities, but it is not promoted as a distinctive indicator of the source of applicant's services.

Exhibit C comprises the search results from the GOOGLE search engine for "Chevron image refresh."  Setting aside the question why a service station customer would be interested in applicant's renovation program, the search results do not call attention to the pole spanner designs.

Exhibit D is two news articles.  The first article was published in the on-line magazine *The Auto Channel* regarding applicant's renovation program and informing the reader that applicant "has modernized its trash valets and signature spanners to create a practical and engaging experience for customers each and every time they visit Chevron stations."  While the author of this article has noted that applicant's pole spanner design is a "signature"

---

[7] Applicant's Brief, p. 10.

feature of applicant's renovated service stations, there is no evidence corroborating that consumers recognize the spanners as "signature" features identifying applicant's services or that applicant has in any way sought to capitalize on that feature.

The second article is in *Convenience Store* magazine regarding applicant's renovation project and informing the reader that the "illuminated pump spanners and unlit valences … provide a more open feeling."  However, feelings of openness are not probative of whether applicant's customers perceive its proposed mark as a source indicator.

Applicant submitted excerpts from consumer research purportedly showing the strength of Applicant's brand identity and establishing that Applicant's spanner design is a recognized part of Applicant's brand identity, with a favorable image among consumers (Exhibits F, G, and H to the December 30, 2008 response).  According to applicant, "[t]hese documents demonstrate that Applicant has an extremely high brand identity and image among consumers nationwide."[8]  While applicant may have a high brand identity and image, there is no evidence that the pole spanner design has any consumer recognition as a service

---

[8] Applicant's Brief, p. 11.

mark apart from applicant's other indicia of source, including its previously registered CHEVRON and design marks.

Exhibit F is a consumer research report on service station image. The report identified four service station elements affecting a positive purchaser experience: the gas pump, the canopy, the spanner and the trash can. "[T]he gas pump is the most important element of consumers' buying experience followed by the canopy. … Least important elements are the spanner and the trash can, in that order. … the gas pump element has a decisive lead in importance across all regions." The report also concludes that "[a]bout 4 of 10 motorists rank the SPANNER high in importance in relation to a positive buying experience." Applicant asserts that this report "shows that the spanner is a recognizable source of applicant's services and has influenced customer identification and selection of services."[9] We are not persuaded. The fact that consumers may consider the spanner an important factor in their purchasing experience does not mean that they recognize it as a trademark. Also, the excerpt of the report produced by applicant does not provide any information regarding the

---

[9] December 30, 2008 Response to Office Action, p. 6.

18

procedures for obtaining the information so it is difficult to assess its reliability.  In this regard, we do not know whether consumers independently identified the gas pump, the canopy, the spanner and the trash can as elements of their purchasing experience or whether consumers were asked to evaluate these particular elements.  If the latter, we do not know whether consumers would have recognized the spanner as an independent element.  They could have considered it to be part of the gasoline pump.

Exhibit G is a document entitled "U.S. Market Track 2008 Brand Seeking Behavior."  According to applicant, this report "indicates the strength of the Chevron brand and the distinctive elements it has adopted to promote its brand, especially amongst customers who 'brand seek.'"[10]  While the report indicates that applicant has strong brand recognition in its CHEVRON mark, it does not reference the pole spanner design.

Exhibit H is a document entitled "Customer Satisfaction and Intent to Re-visit."  Applicant contends that this document "shows that applicant's stations, featuring the spanners, have a strong brand loyalty in comparison to its competitors."[11]  There is no reference to

---

[10] December 30, 2008 Response to Office Action, p. 6.
[11] *Id.*

the pole spanner design and simply no basis to conclude that the pole spanner design has any effect on brand loyalty.

In considering the totality of the probative evidence - - applicant's use of the design sought to be registered since 1988 and applicant's business success, including brand loyalty - - and also considering the common usage of pole spanners by many other service stations, we find that the evidence is insufficient to show that the design of applicant's pole spanner design has acquired distinctiveness.

**Decision**:  The refusal to register on the ground that the subject matter sought to be registered is not inherently distinctive is affirmed.  The alternative refusal on the ground that the subject matter sought to be registered has not acquired distinctiveness under Section 2(f) is also affirmed.